## In re Anonymous No. 24 D.B. 78

HENRY, *Board Member*, March 29, 1979—

## I. HISTORY OF THE CASE

This matter concerns the failure of an attorney to return to his client a fee in the amount of $650 paid by his client in connection with a divorce proceeding. The client and his spouse resolved their difficulties on the evening of the day after the fee was paid and notified respondent on the following day that it was not necessary to proceed. Respondent has conceded that he provided no services and was not entitled to any part of the fee but he had spent the money and was financially unable to pay it back. Initially, it was determined that respondent should receive an informal admonition from disciplinary counsel conditioned upon his repayment of the money. The informal admonition was given,

but when respondent failed to return the $650, formal charges were instituted.

A petition for discipline charging respondent with violation of Disciplinary Rule 9-102(B)(4) (failure to promptly pay or deliver to the client funds the client is entitled to receive) was filed on April 27, 1978. No answer was filed and the matter was assigned to a hearing committee. A hearing was held on June 7, 1978. On July 25, 1978, the hearing committee made a tentative decision that there had been an apparent violation of the code and the parties were notified to submit any relevant evidence with respect to the appropriate discipline to be imposed. Disciplinary counsel submitted reports of previous discipline imposed by the [ ] bar association and the disciplinary board. The hearing committee filed its report on January 29, 1979, recommending an informal admonition with probation. A brief on exceptions was filed by disciplinary counsel and the matter was referred to this board for review. It was the unanimous opinion of the disciplinary board that respondent receive a private reprimand for the reasons set forth below.

## II. FINDINGS OF FACT

1. On August 22, 1977, respondent received a retainer fee from [Mr. A] in the amount of $650 for legal services involved in obtaining for [Mr. A] a divorce from his wife, [Mrs. A], and certain related services.

2. Although respondent had previously performed other legal services for [Mr. A] the fees for these services had been paid in full before August 22 and respondent was owed no further fee with respect to these matters.

3. On August 24, 1977, respondent's secretary was informed of the fact that [Mr.] and [Mrs. A] had reconciled and that no divorce was desired. On August 25 or 26, this same message was conveyed to respondent personally by [Mr.] and [Mrs. A].

4. The only services performed by respondent with respect to the intended divorce action between [Mr.] and [Mrs. A] consisted of three conferences, one with [Mr. A], one with [Mrs. A], and a final one with [Mr.] and [Mrs. A] together.

5. At the final conference with [Mr.] and [Mrs. A], respondent informed them that he had not filed any papers with respect to the divorce and that, although he was unable to return the money at the time, he would return the entire fee paid by [Mr. A].

6. Despite respondent's promise and a number of telephone calls and letters from [Mr.] or [Mrs. A] to respondent in the intervening months, respondent did not return the fee to [Mr. A] until May 18, 1978.

7. Respondent did not return the fee to [Mr. A] until [Mr. A] had obtained a judgment against respondent and had had a sheriff's sale scheduled for the very day on which the money was returned.

8. When respondent did return the fee to [Mr. A] on May 18, 1978, he did so without deducting any amount whatever for services performed. In addition, he paid all of the costs involved in obtaining judgment and execution.

9. Respondent's failure to repay the fee in this case was not a result of willful disregard, but of unexpected financial reverses which left him unable to pay his obligations as they came due.

10. On May 15, 1964, respondent was informally admonished by the [   ].

11. On April 24, 1970, respondent was reprimanded by the [   ].

12. On March 8, 1971, respondent was admonished by letter by the [ ].

13. On May 29, 1973, respondent was censured by the [ ].

14. On four occasions, the first being January 15, 1976, and the last being March 9, 1978, respondent received an informal admonition from chief disciplinary counsel.

## III. DISCUSSION

The board has been favored by a very complete and sensitive report by the hearing committee, portions of which are set forth below because they accurately set forth the factual situation and raise important issues with respect to the type of discipline to be imposed in cases of this nature which must be addressed.

"Respondent readily concedes that he accepted a legal fee of $650 from [Mr. A] in order to institute a divorce action by [Mr. A] against his wife. [Mr. A] retained respondent on August 22, 1977, and paid the entire $650 fee on that day. At that time, [Mr. A] asked respondent to turn over certain certificates and bonds in his wife's name which he asked respondent to turn over to the wife.

"The following day, respondent telephoned [Mrs. A] and asked her to come into his office to pick up the papers which her husband had turned over to him. That same evening, [Mr.] and [Mrs. A] decided to reconcile and the next morning informed respondent of that fact. Almost immediately thereafter, [Mr.] and [Mrs. A] met with respondent and informed him of the reconciliation in person. At

that time, respondent told them that he had not done any work on the case—obviously with the exception of the three meetings here described—and promised to return the fee paid.

"It is equally undisputed that, despite the facts recited above, respondent failed to return the fee to [Mr. A] or his wife until May 18, 1978, more than eight months after he had promised to return it. Morever, respondent conceded that he had received letters demanding the return of the fee and that he did not return it until a judgment had been obtained against him and there had been notice of a sheriff's sale posted for his property for May 18, 1978, the date that the payment was finally made.

"Respondent's testimony at the hearing, beyond his admission that he failed to repay the unearned retainer, included an explanation of the circumstances which had led to this non-payment. Respondent, a well known member of the criminal defense bar whose participation in frequent major homicide cases is common knowledge to the members of the panel, testified before the hearing committee that there had been a long period of time when he had tried approximately 20 murder cases a year. As a result, he sent his eldest daughter to law school and his two younger daughters to a private school; similarly, he moved from a [   ] row house to a new house which he expected would cost him $125,000. At the same time the new house turned out to cost more than twice its original estimated cost, a change in court rules leading to the speedy disposition of homicide and other criminal cases cut deeply into the size of respondent' practice. The combination of new and unexpected borrowings with a reduction in the size of respondent's income

from the trial of homicide cases* led to an inability of respondent to meet his obligations. Thus, when respondent agreed to return the fee in the [Mr. A] divorce case, he simply did not have the funds with which to do this. . . .

"There seems little need to discuss the facts relating to the violation of the code charged in this case. Respondent concedes that he agreed to repay an unearned fee and that he failed to do so for more than eight months until his property was about to become subject of a sheriff's sale. Under the circumstances, there can be no question but that respondent violated Disciplinary Rule 9-102(B)(4).

"What does merit far more extended discussion is the discipline recommended by the hearing committee. Throughout this case, respondent has failed to answer the formal charges againt him, the letter of assistant disciplinary counsel or the importunings of his client and his client's wife. Moreover, the material submitted by assistant disciplinary counsel indicates that this failure to respond has been something of a pattern in respondent's law practice, particularly of late. Were this the entire record before us, the hearing committee would unhesitatingly recommend a formal censure of some sort.

"This is not, however, the entire record. Rather, the picture before us is of a sincere and highly moti-

---

*A second effect of the speedy trial rule lay in the fact that, whereas the family of an accused formerly would spend months raising the fee for a private attorney to be paid in advance, at the cost of delaying the trial, families increasingly are unable to raise the fees for private counsel under the pressure of the speedy trial rule, so that cases tend more often to go to appointed counsel. Even if respondent were to be appointed, his fee would be paid by the city only after the completion of the case, rather than in advance.

vated lawyer whose life and practice have gotten out of hand as a result of factors not entirely within his control. Equally important, respondent had already received an informal admonition in this case on March 9, 1978, [   ] for this very violation of D.R. 9-102(B)(4). This admonition was later withdrawn because, when respondent was informed that repayment of the $650 fee was a condition of the disposition of the charges, he did not make the payment. Once again, the fact that this failure to pay was a result of unavailability of funds rather than willful neglect convinces us that the previous discipline is appropriate, the money having now been repaid.

"Most important, however, in the minds of the hearing committee is the apparent failure of the Bar and the Disciplinary Board to heed the recommendation of a prior panel which had conducted an extensive hearing concerning respondent's behavior in [   ]. That committee, having dismissed as unsupported by the record nine of ten charges brought against respondent, did find that respondent had violated D.R. 6-101(A)(3), dealing with neglect of a legal matter entrusted to an attorney. The panel, however, found that there were circumstances involved in respondent's practice which required that other segments of the Bar come to his aid:

"'As will be stated more specifically hereinafter, the panel recommends that respondent be admonished. However, the panel also recommends that respondent' work load be reviewed from time to time to avoid the type of situation which has occurred in the [   ] matter. Concededly, respondent is a lawyer of outstanding abilities and talents and his services are much in demand, particularly

within the black community. Pressures which are brought on him from within the black community make it very difficult for him to decline particular representations of clients. As a result of such pressures, respondent has in the past, and likely will in the future, find himself under such time pressures and work loads that he is unable to complete and fulfill all of the demands being made upon him. For these reasons, the panel believes that the Disciplinary Board should oversee the respondent's activities for at least a twelve month period. It is believed that an inventory of respondent's case load should be made and that it should be reviewed periodically to show dispositions, additions, and compliance with the needs of respondent's clients. It may be that one of the members of the hearing panel should be assigned by the board to aid and assist disciplinary counsel to monitor the respondent's activities.

"'A program such as that recommended by the panel would be an aid in helping respondent serve those who need him most urgently—the black community, which relies upon his services and those of a relatively few other lawyers. It appears that there have been efforts in the past by administrative judges to assist in meeting the problems which confront respondent. The panel believes that it could be done more effectively by lawyers who understand his problems and will be able to meet with him more frequently, and counsel with him more often, at times convenient to him.'" (hearing committee report, pp. 12-13)

"Despite the very substantial progress that has been made in the past decade, it is clear that there is still a substantial problem facing the black community and the black lawyers who have chosen to

serve that community. Although many black lawyers serve the same clients that are served by white lawyers, and although many white lawyers spend substantial amounts of their time performing services for black clients, including relatively indigent black clients, the fact remains that there are a substantial number of black clients who, particularly at times when they face serious trouble, turn to the services of black lawyers with whom they feel they can best identify. It is also clear that, for whatever reason, the number of experienced able black lawyers available to handle these cases, although greatly increased in recent years, is still only marginally adequate, at best. Under these circumstances, it is not surprising that attorneys like respondent, recognizing the need of their people, have been tempted to take on more work than they can handle and have sacrificed long term efficiency of operation for the short term ability to provide services.

"This is not to suggest that lesser standards should be applied to black attorneys than to their white counterparts. Rather, we concur in the recommendation of the hearing committee whose report is quoted above that the organized Bar must undertake to aid respondent in complying with all of the standards necessary to the ethical operation of his law practice. In this respect, we note that respondent has never been found to have engaged in any conduct involving moral turpitude of any sort, and that all of the failings to which he has been found subject involve neglect or delay. For this reason, we recommend that respondent be subject to informal admonition because of his delay in the returning of the retainer involved in the present case, and that that admonition be coupled with probationary support of the type contemplated by

the hearing committee whose report is quoted above."

One of the primary objectives of the disciplinary system in Pennsylvania and the professional staff and volunteers charged with the responsibility of administering it is to assure that the misconduct by an attorney that has led to disciplinary action will not occur again. This has been accomplished in serious cases by suspension which places the burden on the attorney to establish through the reinstatement process that he is able to resume the practice of law. Informal admonitions, private reprimands and censures administered by disciplinary counsel, the Disciplinary Board and the Supreme Court respectively, are invariably concluded with language warning respondent of the consequences of a repeat offense but, more importantly, frequently include a discussion and review with the attorney of the causes of his difficulties and the possible means of avoiding them in the future. By order of the Supreme Court dated June 28, 1976, and effective October 26, 1976, probation was first made available as a form of discipline in Pennsylvania (Pa.R.D.E. 204(3), (4) and (5) ). Probation can only be imposed by the Disciplinary Board in conjunction with a private reprimand or by the Supreme Court either in conjunction with a public censure or alone. This action was taken in part in response to the expressions of need for this type of discipline such as those contained in the report and recommendations of the hearing committee that dealt with [respondent's] previous case in 1974.

Since the fall of 1976, probation has been used sparingly. It has proved to be workable and effective where an attorney's difficulties stem from physical or mental problems and he is capable of

handling his professional affairs when these conditions are under treatment. In these instances, the terms of probation consist of a prescribed program of medical or psychiatric care. Probation has only been imposed on one occasion where these problems were not the controlling factor. The reasons for our reluctance in this regard are the myriad problems attending its implementation including, but not limited to, the recruiting of volunteer monitors, the establishment of effective guidelines and the difficulty of evaluating the results. Paramount, however, has been the concern as to whether or not probation can work when imposed upon a respondent without his voluntary acceptance since his cooperation is so essential for success.

Attorneys who get into difficulty range in attitude from remorseful to sullen to defiant. Constructive programs to prevent recidivism must be undertaken with these attitudes in mind. It has been the policy of this board to encourage attorneys to seek on their own the assistance they need to restore their affairs to order without a definitive set of probationary rules. It is imperative that the members of the legal profession individually and through various state, local, ethnic and special interest organizations provide whatever help is needed. No finer example exists than the Special Committee on Alcohol and Drug Addiction of the Pennsylvania Bar Association. Where the charges are more serious and respondent lacks the self-discipline to deal with his problems without a structured program, probation may be appropriate. However, unless the attorney exhibits some interest by taking the initiative to suggest the type of program and responsible monitors to assist him,

this board is reluctant to recommend probation. When the attorney has not demonstrated a positive attitude and the charges are serious, it would seem that it is better to impose a suspension which will compel him to seek the necessary help prior to reinstatement rather than take the time of professionals and volunteers to develop and administer a program that has very little real chance of success.

Reviewing the record of respondent in the instant matter, it would certainly appear that the recommendations of the hearing committee in this and the previous case were worthy of consideration with respect to [respondent's] past difficulties which primarily involved neglect of matters resulting from an extensive practice he could not handle. The current problem, however, is the result of a complete change in his circumstances where he is in financial difficulty and could not repay an unearned fee. It is difficult to conceive of a probationary program that will deal with this state of affairs. While this may be the manifestation of a greater problem, the most effective way to deal with this is through the application of the broad range of services that are available from the legal profession and elsewhere. It is the responsibility of [respondent] to seek the help. It is the responsibility of our profession and the community at large to provide it. A structured program of probation should not be necessary to accomplish this. For these reasons, it is the recommendation of this board that respondent, [ ], receive a private reprimand.

## ORDER

And now, March 29, 1979, the report and recommendation of hearing committee [ ] dated January

29, 1979, has been considered, and it is ordered and decreed, that the said [respondent], of [   ] County, be subjected to private reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania as provided in Rule 204(5) of the Pennsylvania Rules of Disciplinary Enforcement at the next session of this board.